Frank L. YOUNG, Appellant,

v.

Howard S. DWORKIN, Appellee.

Patent Appeal No. 9004.

United States Court of Customs
and Patent Appeals.

Jan. 17, 1974.

Rehearing Denied Feb. 14, 1974.

Paul Maleson, Maleson, Kimmelman &
Ratner, Philadelphia, Pa., attorney of
record, for appellant.

Howard S. Dworkin, pro se.

Before MARKEY, Chief Judge, and
RICH, BALDWIN, LANE and MILL-
ER, Judges.

MILLER, Judge.

This is an appeal from the Board of
Patent Interferences [1] which awarded
priority to the senior party-appellee on
the grounds that the junior party-appel-
lant had suppressed or concealed the in-
vention. 35 U.S.C. § 102(g). We af-
firm.

## FACTS

The invention is an expansible enve-
lope formed from single blanks of folda-

---

1. Interference No. 96,865 between Young on
his application No. 703,663, filed February 7,
1968, and Dworkin on his application No.
694,141, filed December 28, 1967.

ble material. The envelope is open at the top and has a gusset (an inward bellow-type fold forming a triangular insert) on each of the two sides plus one at the bottom, thereby permitting expansion into a box-like configuration.

It appears that sometime prior to November 4, 1965, appellant conceived the invention which, according to his testimony, would be adaptable to machine folding and gluing of the bottom gusset. Existing three-gusseted envelopes, which were of a different construction from the invention, were only partially manufactured, by machine, the bottom gusset requiring a hand folding and gluing operation. Thus, appellant's objective was to design a three-gusseted envelope which could be entirely machine-manufactured. Upon receipt by his company of an order for 15,000 three-gusseted filing envelopes from the School District of Philadelphia on November 4, 1965, appellant constructed a model of the envelope. This was introduced into evidence and found by the board to be a completed article, capable of actual use, and further found to have constituted a reduction to practice.

In November, 1965, appellant showed the model to the company vice-president for production and to the plant superintendent, who made a drawing and had a die prepared for the new design. Using the die, paper blanks for the entire order were prepared, and about the last week of November, 1965, were run through one of the company machines. However, the glue did not register in the right positions, the paper blanks were scrapped, new blanks were re-die-cut for hand-fold manufacture, and the order was completed by hand. Nothing further was done with the invention until after August 26, 1966, when an order for 6,000 envelopes was received from the Social District of Philadelphia. Appellant decided to make this run with the new design on another company machine, with new gears and new belts designed to overcome the glue problem encountered in the first run nine months earlier. However, the glue problem was not overcome, and this run (made in September, 1966) was unsuccessful. The paper blanks were thrown away, and again the order was completed by hand, using new blanks for hand-fold manufacture.

No further attempt was made by appellant to produce the invention on the company's existing machines. However, some eight months later appellant attended an international paper-converting machinery show in Dusseldorf, Germany, for the purpose, as he testified, of looking for a standard folding and gluing machine which would answer the glue problem. Appellant testified that he felt all of the machines that he saw there would handle the problem, but, upon his return, he directed his vice-president for production to get in touch with the International Paper Box Machine Company in New Hampshire, because it was the only company from the United States at the show and would probably provide better service. In the first week of August, 1967, the vice-president visited the International plant in New Hampshire. He made subsequent trips to the plant and ordered a machine on September 13, 1967. The machine was delivered late in December, 1967, assembled, and put into operation in January, 1968. Appellant testified that approximately 25,000 envelopes of the invention design were successfully run off during January.

Meanwhile, on October 31, 1967, some five months after attending the show in Dusseldorf, appellant wrote to his patent lawyer, enclosing samples "to show the style and construction of the expanding envelopes which can be manufactured on the new machine" and saying, "I think we should apply for a patent very soon." However, no showing was made of when the lawyer was directed to proceed in drawing up the application. It was not until February 7, 1968, following the successful runs on the new machine the month before, that appellant filed his application for a patent.

Under cross-examination appellant testified that he had been in touch with his

patent lawyer prior to writing the letter of October 31, 1967, and that "I told him I had invented a new design and that we had experimented with it; *we knew that it was a practical design* but we were unable to manufacture it with our present equipment." (Emphasis supplied.)

When asked on cross-examination whether it was his usual practice to delay a period of two years after conception before taking up an invention with his patent solicitor, appellant responded: "I do not apply for a patent until I am positive that we can manufacture the item."

When asked on cross-examination whether it was correct that his reason for not seeking out the services of his patent solicitor in 1965 was his "doubts" that the envelope could be manufactured at that time, appellant testified: "I had no doubts that it could be manufactured. My doubts were that we could not manufacture it with our present equipment, and the patent itself would be of no value to us unless we could manufacture it."

Under cross-examination appellant testified, "Oh, yes," in response to the question: "During the time from November, 1965, to May, 1967, was there a continuous demand for gusseted envelopes?" He also said, "That is correct," in response to the question: ". . . I understand that it is much cheaper to make these envelopes by machine than it is by hand; is that correct?"

The board noted that the record shows all of appellee's activity to have occurred between January 31, 1967, and the date of filing his application for a patent on December 28, 1967, with reduction to practice no later than October 6, 1967, at which time an envelope constructed according to the terms of the count was delivered and explained to his patent lawyer.

There is no evidence in the record to indicate that either party knew of the other party's activities regarding the present invention until the Declaration of Interference by the Patent Interference Examiner dated June 9, 1969. There is no evidence that appellant disclosed his invention to anyone outside his company, except for a representative of the International Paper Box Machine Company, until it was made known to his patent lawyer in October of 1967.

## OPINION

The record before us supports the board's finding that appellant's invention was reduced to practice and, further, that this occurred in November, 1965.

■■ The sole remaining question is whether the board correctly held that junior party-appellant suppressed or concealed his invention within the meaning of 35 U.S.C. § 102(g). Here, senior party-appellee bears the burden of proof by a preponderance of the evidence, notwithstanding junior party-appellant's burden on the issue of priority of invention which he has sustained. Gallagher v. Smith, 206 F.2d 939, 41 CCPA 734 (1953).

In considering the question, we point out that section 102(g) is concerned with the subject of priority of invention and, for interference purposes, provides that a person shall be entitled to a patent unless "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." By its enactment as part of the Patent Act of 1952, Congress codified the body of law which had accumulated on the subject of priority of invention, including the legal concept of "suppression or concealment."

We note that commencing with the first edition of Webster's dictionary in 1828 [2] and continuing to the present the definition of "suppress" has included the idea of keeping from public knowledge. It is to be expected, of course, that the courts would be aware of the definition,

---

2. An American Dictionary of the English Language, S. Converse, New York, 1828.

which fits very well with their statements on the clear policy against suppression underlying our interference laws, both prior to and including 35 U.S.C. § 102(g). Long ago this policy was explained by the U.S. Supreme Court in *Kendall v. Winsor,* 62 U.S. (21 How.) 322, 328, 16 L.Ed. 165 (1858) as follows:

The true policy and ends of the patent laws enacted under this Government are disclosed in that article of the Constitution, the source of all these laws, viz: "to promote the progress of science and the useful arts," contemplating and necessarily implying their extension, and increasing adaptation to the uses of society. . . . By correct induction from these truths, it follows, that the inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress. He does not promote, and, if aided in his design, would impede, the progress of science and the useful arts.

*Mason v. Hepburn,* 13 App.D.C. 86, 1898 C.D. 510 (1898) has generally been regarded as the origin of the suppression and concealment doctrine. There the court (13 App.D.C. at 96), after quoting from *Kendall v. Winsor,* emphasized the "policy and spirit of the patent laws" underlying the doctrine as follows:

The true ground of the doctrine, we apprehend, lies in the policy and spirit of the patent laws and in the nature of the equity that arises in favor of him who gives the public the benefit of the knowledge of his invention, who expends his time, labor, and money in discovering, perfecting, and patenting, in perfect good faith, that which he and all others have been led to believe has never been discovered, by reason of the indifference, supineness, or wilful act of one who may, in fact, have discovered it long before.

In *Thomson v. Weston,* 19 App.D.C. 373, 1902 C.D. 521 (1902), the court reaffirmed its *Mason v. Hepburn* doctrine —again in reference to "the true policy and ends of the patent laws":

[B]y deliberate concealment or suppression of the knowledge of his [the inventor's] invention he subordinates his claim, in accordance with the general policy of the law in the promotion of the public interest, to that of another and *bona fide* inventor who during the period of inaction and concealment shall have given the benefit of the discovery to the public. Viewed in the light of "the true policy and ends of the patent laws," the latter is the first to invent, and therefore entitled to the reward.

This court has clearly followed the *Mason v. Hepburn* doctrine. *Brokaw v. Vogel,* 429 F.2d 476, 57 CCPA 1296 (1970); *Woofter v. Carlson,* 367 F.2d 436, 54 CCPA 917 (1966). It has, to be sure, cautioned that the doctrine is to be applied only where the record sustains the burden of proving suppression or concealment. *Frey v. Wagner,* 87 F.2d 212, 24 CCPA 823 (1937); *Woofter v. Carlson, supra.* At the same time, the court has declared that application of the *Mason v. Hepburn* doctrine is not to be confined to "extreme cases" and that it—

. . . is a very healthy rule to be invoked in the public interest whenever the fact situation warrants it. While the law may abhor a forfeiture, the *Mason v. Hepburn* principle is not a forfeiture in the true sense; rather, it is a rule according to which the patent right goes to the most deserving.

*Brokaw v. Vogel, supra.* Needless to say, evidence of one party's being "first to file" would hardly satisfy his burden of proving suppression by the other party.

█ As we have done before, we emphasize here that each case involving the issue of suppression or concealment must be considered on its own particular set of facts. *Myers v. Feigelman,* 455

F.2d 596, 59 CCPA 834 (1972); Engel-hardt v. Judd, 369 F.2d 408, 54 CCPA 865 (1966). In such consideration, two guideposts have been firmly established:

■ First, the length of time from reduction to practice to filing of an application for a patent is not determinative. Woofter v. Carlson, *supra;* Schnick v. Fenn, 277 F.2d 935, 47 CCPA 1174 (1960). Mere delay, without more, is not sufficient to establish suppression or concealment. Gallagher v. Smith, *supra.* However, the warning has been sounded that one who delays filing his application does so at the peril of a finding of suppression or concealment due to the circumstances surrounding the delay. Woofter v. Carlson, *supra.* See also Watson, Commissioner of Patents v. Allen, 103 U.S.App.D.C. 5, 254 F.2d 342 (1958); International Glass Co., Inc. v. United States, 408 F.2d 395, 187 Ct.Cl. 376 (1968).[3]

■ Second, spurring into filing an application for a patent by knowledge of another's entry into the field (e. g. by issuance of a patent) is not essential to a finding of suppression or concealment. Dewey v. Lawton, 347 F.2d 629, 52 CCPA 1573 (1965); Brokaw v. Vogel, *supra;* Gallagher v. Smith, *supra.*

■ Bearing these points in mind, we now turn to the question of appellant's intent to suppress. This, if established by the evidence of record, coupled with the delay in filing his application for patent, would support the board's finding of "suppression" for purposes of 35 U.S.C. § 102(g). The facts show a delay from reduction to practice in November of 1965 until February 7, 1968, when appellant's application for a patent was filed. During this period there was a "continuous demand" for gusseted envelopes which, if machine-produced, would cost less.

The delay was *not* for the purpose of perfecting appellant's invention—a critical point of distinction from other cases holding that delay was justifiable and, therefore, suppression or concealment had not been proved. Frey v. Wagner, *supra* ("The law does not punish an inventor for attempting to perfect his process before he gives it to the public. . . . reasonable experimentation is frequently encouraged."); Altorfer v. Haag, 74 F.2d 129, 22 CCPA 806 (1934) (following reduction to practice, frequent and comparative tests of machines equipped with the invention with a view to determining best materials for manufacture of invention and refinements that should be made); Dewey v. Lawton, *supra* (testing and refinement of invention for more than a year after reduction to practice); Schnick v. Fenn, *supra* ("mitigating circumstances" included continuing development, after reduction to practice, of best design and tests in further perfecting the invention); Watson, Commissioner of Patents v. Allen, *supra.*

Instead, the evidence discloses that the delay here resulted from appellant's intent to wait, without disclosing his invention—not to perfect the invention, but: first, to determine whether the invention could be produced with his company's own equipment; then, when that could not be done (after two attempts nine months apart), some eight months later to locate a machine which would enable his company to manufacture it; and, finally, some eight months after that, to have a successful run on the new machine. Appellant argues that a "generalized search" went on for a machine to produce his envelope. However, this is based on mere hearsay testimony of the supervisor of appellant's plant, as follows:

Q. What was being done in the office then?

---

3. Thus, when the delay period is determined to be "unreasonable," there is a basis for inferring an intent to suppress. Brokaw v. Vogel, *supra.* The activities of an inventor during the delay period (e.g. steps to improve or perfect the invention after it has been reduced to practice) may well *excuse* the delay and, thereby, support a finding that it was "reasonable." Frey v. Wagner, *supra.*

A. They were trying to find better equipment.

Q. Were any of their efforts brought to your attention?

A. No.

Q. How did you know they were trying to find better equipment?

A. Because they did. When I say they were not brought to my attention nobody said "We are going out to look at this and this machine," but there was discussion about trying to find a machine but the actual discoveries or failures were not discussed with me.

Aside from appellant's trip to the Dusseldorf show over a year and a half after reduction to practice and the follow-on visits to the International plant in New Hampshire by the company's vice-president, the record is devoid of any meaningful evidence to support appellant's "generalized search" argument. Rather, it supports a finding of total inactivity. For example, appellant has made no showing that an equipment catalog was consulted or that even one telephone call or letter of inquiry was made to a machine manufacturer prior to his trip to Dusseldorf where, interestingly, he located a machine produced by a U.S. manufacturer. Considering the two unsuccessful runs on the machines of appellant's company, we believe some such evidence should have been forthcoming to establish ordinary business prudence on the part of appellant in locating a suitable machine during the over a year and a half period following reduction to practice.

In his own words, appellant's excuse for the delay in filing his application was simply: "I do not apply for a patent until I am positive we can manufacture it." And, indeed, appellant delayed filing his application until after the successful run, when he was positive that the invention could be produced on his company's new machine. Unlike Schnick v. Fenn, *supra*, where early in the delay period the inventor had his patent attorney make a preliminary search for which his company was billed, appellant delayed some twenty months after reduction to practice before furnishing his patent lawyer samples of his invention. This was five months after the Dusseldorf show where, appellant testified, he thought all the machines he saw would satisfy his problem. Even then, appellant merely told his patent lawyer that he thought "we should apply for a patent very soon." And it was not until over three months later, after the successful runs on the new machine, that appellant filed his application.

Meanwhile, as found by the board, appellee, without knowledge of appellant's activities, conceived and reduced his invention to practice between January 31, 1967, and October 6, 1967, at which time he delivered and explained to his patent lawyer an envelope constructed according to the count. Less than three months later, he filed his patent application. Also, the record shows that in early March, 1967, appellee sent samples of blanks for envelopes to the International plant in New Hampshire to be run on an experimental machine (which was built for exhibition at the Dusseldorf show later in the year). Appellee made a downpayment for one of the machines by check dated May 1, 1967, and the machine was delivered in late July or early August, 1967. We believe the nature and tempo of appellee's activities were in accord with ordinary business prudence.

In view of the foregoing and considering the record as a whole, we hold that junior party-appellant suppressed his invention within the meaning of 35 U.S.C. § 102(g).

The decision of the board is affirmed.

Affirmed.

RICH, Judge (concurring).

The United States patent system is a first-to-invent system, wherefore we have interferences to determine, in cases of conflict, who the first inventor is. But for at least a century it has been a

qualified first-to-invent system. The de facto first inventor has not necessarily been adjudged to be the de jure first inventor. In Mason v. Hepburn, 13 App. D.C. 86 (D.C.Cir.1898), the court expressed its conclusion that the actual first inventor should not get the patent in two different ways. Its first statement was that "Hepburn must be held to be the first inventor in the sense of the law regulating the grant of patents." (Mason was actually the first inventor.) Its second statement was that Hepburn must "be regarded as the real inventor and as such entitled to his reward." Hepburn, it should be remembered, although the second inventor, already had his patent and the question before the court was whether Mason should get one on the same invention because he was in fact the first inventor.

Though we are accustomed to talking about the Mason v. Hepburn *doctrine,* the court deciding that case in 1898 did not pull its holding out of its hat; it made it on the basis of consistent decisions going back at least to 1872, cited in its opinion, and some of the reasoning appearing in the opinions. Several of these were by Commissioners of Patents or Acting Commissioners and went off on various theories of law including forfeiture, abandonment, abandoned experiment, and estoppel based on laches. But whatever the theory on which the decision was based, the actual first inventor lost out to a second inventor who was being diligent in applying for a patent and making the invention available to the public while the first inventor was being dilatory in those matters.

In view of the fact that the time interval in this case—about 27 months— seems short by comparison with Mason's 7-year delay, I call attention to a few early cases cited in Mason v. Hepburn, the earliest being Monce v. Adams, 1 O. G. 1, 1872 C.D. 1, opinion by Duncan, a perspicacious Acting Commissioner. One of the headnote headings of that opinion is "Forfeiture by laches." The invention in that case was a combination tool consisting of a handle with a putty knife at one end and a glass cutter at

the other. The Commissioner found it to be of doubtful patentability but went ahead and decided the interference anyway. Both parties proved actual reduction to practice, Monce before Adams by about 10 months. The question posed was whether, nevertheless, Adams was "to be regarded as the prior inventor." He was so regarded. The determining factor was the behavior of Monce during a period of 18 months from his actual reduction to practice to his filing date. The evidence showed that Monce never abandoned his invention and always intended to patent it. He had, in fact, consulted his patent attorney about how long it would be safe to wait and was told it had better not be more than two years, by analogy to the then two-year grace period following a public use. (R.S. 4886.) Monce also testified that he delayed taking any steps to make the invention public because he was manufacturing another glass cutter and wanted to fill the market "before introducing a new article." He was spurred into filing by being approached by Adams who wanted Monce to purchase his invention. Monce's 18-month delay for these reasons, during which time Adams proceeded diligently to reduce to practice *and file,* was fatal to his right to a patent. The opinion states:

> This, under the *well-settled practice of the Office,* must be regarded as working a forfeiture of his rights, unless, as he contends, he had an indefeasible right to delay two years after perfecting his invention before making an application upon it. [Emphasis mine.]

It was held there was no such indefeasible right. The underlying policy was stated thus:

> It is true, as often announced, that mere delay, no matter how long continued, cannot impair an inventor's right to a patent. It is only when, by reason of such delay, another party gains the opportunity to give the invention to the world, and actually becomes the first to do this, that the first inventor's rights pass away.

It is also true that the law looks with indulgence upon delays which arise from the circumstances of the party. Hence the requirement of *reasonable* diligence only; but in the present case there was no controlling necessity that compelled delay. It was an intelligent, deliberate act on the part of Monce, and done, not for the purpose of improving the invention before entering upon the manufacture of it, so that the public might eventually reap the greater benefit but for the less praiseworthy object of filling the market with inferior goods * * *.

Thus at that early date, and probably earlier too, the law permitted an inventor a *reasonable* time within which to *perfect* his invention but not to sit around doing nothing with it. Another policy statement in the opinion is that the object of the patent law "is to reward that man from whom the public actually derives the benefit received, unless, in fact, another, prior in making the invention, is proceeding to give it to the world with no further delay than what is imposed by circumstances beyond his control." Thus we see as already established in the Patent Office more than a century ago the policies underlying what we know as "the Mason v. Hepburn doctrine." Even in those early days the controlling factor was not time but conduct.

We also see in these early interferences that the concept of "diligence" was viewed as applying to two different periods: diligence in reducing the invention to practice and diligence in filing a patent application after a reduction to practice. It clearly appears to have been the rule that absence of the latter while a rival inventor industriously brought the invention to public attention through manufacture, or by proceeding with the filing of an application for patent, resulted in loss of the right to a patent by the first inventor unless he could show some good excuse for his inaction. In Mallett v. Cogger, 1879 C. D. 100 (Com'r.Pats.) we find the interesting concept that the second inventor

"rescues the invention from oblivion and confers its benefits upon the public."

In Farmer v. Brush, 1880 C.D. 5 (Com'r.Pats.), Farmer appears to have been the first inventor to have completed the invention but since he did nothing with it for a bit more than two years thereafter, Brush, who already had a patent, received an award of priority "pro forma." The case went off on an abandonment theory.

In Sheridan v. Latus, 1883 C.D. 76 (Com'r.Pats.), the real parties left over from a three-party interference were Latus and one Clarke who was the actual first inventor. He lost out, however, through having given "no thought" to the invention from early 1879 to the summer of 1881, after what clearly appears to have been an actual reduction to practice. Commissioner Marble nevertheless ruled against him on an erroneous application of the "abandoned experiment" doctrine, holding Latus entitled to the patent "not because he was the first inventor, but because at the time he made his invention there was no one, so far as is shown, who had the right to make claim thereto, and that he used due diligence in prosecuting his claim therefor."

It will be noted that Mason v. Hepburn cites the 1890 text Robinson on Patents, § 390 (C.D. p. 516). In this section, which is entitled "Negligence in Applying for a Patent Does not Affect the Rights of an Inventor except by Estoppel," Robinson reviews the above and other cases, concluding that an inventor who has completed his invention is required "to proceed with reasonable diligence to disclose it by applying for a patent, if he desires to claim it *as against a subsequent inventor*" (p. 553, emphasis mine). Noting a conflict in the cases—some courts having refused to rule against a first inventor notwithstanding his laches on any ground short of actual abandonment of the invention to the public—Robinson favored applying an estoppel against a dilatory first inventor. He says (pp. 558–559):

The former rule may on equitable grounds be regarded as the more cor-

rect, since an inventor who, having perfected his invention, voluntarily conceals it and unreasonably delays his application for a patent, thereby wilfully misleads subsequent and innocent inventors into the belief that the field covered by the invention is still open, and he therefore ought to be estopped from patenting the invention and appropriating its exclusive enjoyment to himself after their honest efforts in the same direction have succeeded.[3]

3. There seems to be no good reason why the doctrine of estoppel should not be applied in its fullest extent to an inventor who, having completed his invention, voluntarily delays his application for a patent. In the present condition of industrial enterprise he may be fairly chargeable with knowledge that other persons skilled in the art to which his invention appertains have perceived the same want, that they are striving to discover means by which this want may be removed, and that their inventive efforts are very likely to result in the same art or instrument which he had already produced. If under these circumstances he wilfully keeps silent concerning his prior discovery and permits these later inventors to expend their money, time, and energy in endeavors which would be at once abandoned were he to disclose the character of his own invention, he is certainly not entitled, on any principle of justice and fair dealing, to urge against them his superior right after they have completed their inventive acts and diligently attempted to secure the benefit of the invention to themselves and to the public by applying for a patent. This doctrine would probably have long ago met with universal acceptation had it not been unnecessarily confounded with abandonment of the invention to the public * * *.

I have set forth briefly some of the antecedents of Mason v. Hepburn because I think courts and the bar have recently too much concentrated on the precise facts of that case without appreciating the basic principles underlying the decision, which was far from unique in the annals of patent law in 1898, several years after Robinson expounded those principles. We should now try to understand those principles and not attempt to derive them from Mason v. Hepburn alone, which was but one episode in the development of the law.

In delving into these old cases it becomes apparent that it is not the time elapsed that is the controlling factor but the total conduct of the first inventor. While only 27 months is involved in the case at bar it is clear that in the nineteenth century the Patent Office thought nothing of depriving the first inventor of his right to a patent as against a more diligent second inventor when the period involved from reduction to practice to filing was two years or less. It all depended on what the first inventor was doing during the period of delay. It is clear that it was regarded as a question of "diligence." Robinson in § 390 treats of both diligence in reducing to practice and diligence in filing. Clearly use of the term should not be restricted to the former period. In either case, the existence of diligence depends on what the inventor is doing and the circumstances under which he acts. It may also be a relative matter, taking into account what the later inventor is doing too. Review of our recent opinions on this issue will show that we have tried to take the whole picture into account. As we said in Brokaw v. Vogel, 429 F.2d 476, 57 CCPA 1296 (1970), "What is involved is a policy question as to which of two rival inventors has the greater right to a patent." And again, "it is a rule according to which the patent right goes to the most deserving."

Section 102(g)* under which we have been deciding these cases since 1953 is, without question, a broadly stated codification of previously existing law. It is in part based on a prior statute. The

* § 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

\*       \*       \*       \*       \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

Revisers Note to § 102(g) states that it is derived from R.S. 4920, the second defense, which statute read:

In any action for infringement the defendant may plead the general issue, and, having given notice in writing to the plaintiff or his attorney thirty days before, may prove on trial any one or more of the following special matters:

\*   \*   \*   \*   \*   \*

Second. That he had surreptitiously or unjustly obtained the patent for that which was in fact invented by another, who was using reasonable diligence in adapting and perfecting the same.

The Revisers Note also says of § 102(g), "This paragraph retains the present rules of law governing the determination of priority of invention." We thus have in the present statute, as we had in its predecessor, the concept of "reasonable diligence" in priority contests and we also have, from the body of case law, the rule that a contestant loses, even if he is the first inventor, if he had abandoned, suppressed, or concealed his invention. The meaning of these terms is not to be derived only from dictionaries, even if published before 1952, but from the cases involving priority disputes showing what fact situations were judicially deemed to amount to abandonment, suppression, or concealment. I have touched on some of them but there are many more. If Congress understood anything about § 102(g), it was that it was codifying case law, as the Revisers Note told it, not that it was making law according to Webster's Dictionary.

Taking into consideration the facts of the present case as set forth in the opinion of Judge Miller and the principles which underlie the many decisions which have awarded "priority" to the second inventor in interferences, I conclude that priority in this case was properly awarded by the board to Dworkin and I therefore agree to an affirmance.

In general, I agree with the reasoning of the majority opinion and I believe it intends to apply the law as I see it; but I wish to emphasize that what controls here is § 102(g) and not the Mason v. Hepburn case alone or its limited "doctrine." For that reason, I particularly agree with the majority that "spurring" into activity by an opponent is not essential to a finding of suppression or concealment.

I cannot agree with the board that the question in this case is whether Young "forfeited his *right to a patent*." (My emphasis.) But for Dworkin's conflicting claim, Young forfeited nothing and would get a patent. All he *forfeited*, as I tried to point in Brokaw v. Vogel, supra, last paragraph of the opinion, was the right to rely on his prior actual reduction to practice in a priority dispute. Considering what Robinson said, quoted above, another, and perhaps better, way to have stated it would have been that Young was estopped by his conduct to rely on his reduction to practice in a priority dispute.

In view of § 102(g), however, it is now enough to find that Young *either* suppressed *or* concealed. If he did either, he loses the interference and, by custom, "priority"—the magic word by which all interferences are terminated (even where there is only one inventor and the issue is derivation)—is awarded against him. (Cf. 35 U.S.C. § 135.) Therefore, there is no need to become involved with forfeiture or estoppel or any other legal theory. To this extent the codification of the case law in § 102(g) has simplified matters. There is no longer a need to look to Mason v. Hepburn and its "doctrine" as the source of the law. It is but one of the many decisions codified in the statute, which, as stated above, "retains the present [1952] rules of law governing the determination of priority of invention." The board decided this case under § 102(g) and we are doing likewise. The issue is, therefore, not forfeiture or estoppel or anything other than whether Young suppressed or concealed, since no question of abandonment has been raised. The only reason we have to look

to prior cases is to gain an understanding of the meaning of "suppressed" and "concealed," which concepts have been codified in § 102(g). Case law "doctrines" are no more; the question is now simply one of statutory construction.

I may say that this approach to the law is one which has just occurred to me in the study of this case and I present it in the hope of making the law simpler and clearer in the future by the exclusion from opinions of unnecessary legal theories like forfeiture.