Larry Allen COCHRAN, Appellant,

v.

John M. KRESOCK, Appellee.

Patent Appeal No. 75–591.

United States Court of Customs and Patent Appeals.

Feb. 5, 1976.

Albert Russinoff, Princeton, N. J., attorney of record, for appellant.

Theodore W. Anderson, James T. Williams, Neuman, Williams, Anderson & Olson, Chicago, Ill., attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

LANE, Judge.

This is an appeal from the decision of the Patent and Trademark Office Board of Patent Interferences [1] awarding priority of invention to the junior party Kresock after finding that Kresock had attained an actual reduction to practice of his invention on August 23, 1968, and that subsequent to that date he had not abandoned, suppressed, or concealed his invention within the meaning of 35 U.S.C. § 102(g). This appeal also seeks review of the limitation of the scope of additional discovery granted by the board to the senior party Cochran under 37 CFR 1.287(c). We affirm.

## Background

This is a two-party interference proceeding between junior party Kresock's patent No. 3,654,384 [2] and senior party Cochran's application serial No. 135,935.[3] Cochran copied the counts of the interference from the Kresock patent.

## The Subject Matter of the Counts

The invention is a circuit for improving flesh tones in a color television receiver.[4] A standard color television composite signal includes, inter alia, a wideband brightness signal, commonly called the luminance signal, a subcarrier signal modulated by a pair of difference signals, commonly called the chrominance signal, and a reference burst signal. In a color receiver the reference burst signal is detected and used to control a local oscillator which provides output signals of the proper frequency and phase to a pair of demodulators for synchronously recovering the transmitted color difference signals. The demodulated col-

or difference signals are then matrixed with the brightness (luminance) signal for developing the red, blue, and green signals for the color picture tube. In theory the reference burst signal would always have a precise phase relationship with respect to the modulated subcarrier signal resulting in a proper demodulation of the color difference signals in the receiver. If, for any reason, however, this precise relationship does not exist, demodulation errors will occur, resulting in a shift in the hue of the reproduced colors. Often this hue shift is unnoticed by a viewer because he does not have any preconceived concept of what the correct hue should be. However, in the case of flesh tones a hue shift can readily be detected by a viewer. The circuit involved in this interference reduces, with respect to flesh tones, the effects of phase errors between the reference burst signal and the subcarrier signal by altering the phases of the local oscillator signals fed to the synchronous demodulators to spread the axes along which the color difference signals are demodulated, and by altering the relative gains of the demodulator circuits.

## The Counts

There are twelve counts in this interference which correspond to claims 1 to 12 of Kresock's patent. Count 1 is illustrative:

1. In a color television system, apparatus for processing a color television chrominance signal comprising:

reference signal means for supplying A [sic] fixed frequency reference signal at a nominally predetermined phase;

chrominance channel means for supplying a chrominance signal bearing information in the form of

---

1. Interference No. 98,009.

2. Issued on application serial No. 40,239, filed May 25, 1970. The patent is assigned to the Magnavox Company.

3. Filed April 21, 1971; accorded benefit of serial No. 20,311, filed March 17, 1970, which is

now patent No. 3,617,621. Both are assigned to the RCA Corporation.

4. The invention may also be used for flesh tone compensation at the transmitter.

sideband components of a carrier wave at said fixed frequency;

detection means coupled to said reference signal means and said chrominance channel means for detecting the components of said chrominance signal located at a plurality of phases relative to said nominally predetermined phase, each of said plurality of phases having a predetermined phasic displacement from the remainder of said plurality of phases;

circuit means for switchably altering the phasic displacement of at least one of said plurality of phases from at least one other of said plurality of phases and for altering the amplitude of one of said detected components relative to at least one other of said detected components; and

utilization means coupled to said detection means for utilizing said detected components.

### The Record

The senior party Cochran was accorded the benefit of the filing date (March 17, 1970) of his parent application serial No. 20,311 and chose to rely on that date as a constructive reduction to practice. Kresock took testimony and introduced evidence to prove a prior actual reduction to practice.

The uncontested testimony and evidence introduced by Kresock indicate that Kresock began work on his invention in July, 1968, culminating in a demonstration of his flesh correction circuit to his superiors and co-workers at Magnavox on August 23, 1968. At the demonstration the Kresock circuit was selectively switched in circuit in a commercial television receiver, and results were observed on the receiver's picture tube for a variety of program sources, including live broadcasts, color slide material, and color bar patterns. Those present at the demonstration who testified stated that they observed a flesh tone correction when the Kresock circuit was switched in circuit over a wide variation in phase errors between the reference burst signal and the color difference subcarrier. The evidence further shows that although the Kresock circuit improved flesh tones, it also caused a degradation in the reproduction of other colors, particularly of the color green, which was also observed by those present at the demonstration. Following the demonstration several memoranda were written by Magnavox personnel commenting on the Kresock circuit and noting in particular the fact that the circuit achieved good flesh color correction over wide variations in phase error at the expense of a degradation in the reproduction of other colors. The Kresock circuit was dismantled after the demonstration in September, 1968, and there is no evidence in the record which indicates that any further work was thereafter performed on this circuit.

The record further shows that after Kresock's circuit was demonstrated and then dismantled, a period of approximately 9 months passed before Kresock prepared a patent disclosure of his invention in June and July of 1969. This patent disclosure was held by Knauer, a Magnavox employee, until a meeting of the Magnavox patent committee which occurred between April 1 and April 3, 1970. At that meeting a decision was made to file a patent application on the Kresock invention. There is no evidence to indicate why Knauer held the patent disclosure from July, 1969, until April, 1970.

Prior to the April, 1970 meeting of the Magnavox patent committee, RCA commercially introduced its version of a flesh correction circuit, which commercial introduction was reported in a periodical named *Television-Digest* (hereinafter *TV-Digest*) in March, 1970. The evidence shows that Magnavox personnel, at some point in time, learned of the specific details of the RCA circuit. However, there is no substantial evidence in the record to indicate whether those present at the Magnavox patent committee meeting in April, 1970, knew of the specific details of the RCA circuit when a decision was made to file a patent application on Kresock's invention.

The evidence does indicate that at least some of those present at the patent committee meeting had a general knowledge of RCA's introduction of a flesh correction circuit.

### The Board

The board found that the August 23, 1968, demonstration of the Kresock circuit was an actual reduction to practice, notwithstanding the fact that the circuit degraded the reproduction of other colors. It reasoned that although the evidence showed some degradation in the reproduction of other colors by the Kresock circuit, this evidence did not leave one with an impression that the demonstration was a failure or that satisfactory flesh correction results were not obtained. The board particularly noted that the contemporaneous documents did recite that acceptable flesh correction was observed for phase errors of ± 30°, and that the evidence of record illustrated that all flesh correction circuits involved trade-offs between accurate flesh tone and accurate background color.

After finding an actual reduction to practice by Kresock, the board then considered whether the Kresock circuit was later abandoned, suppressed, or concealed within the meaning of 35 U.S.C. § 102(g).[5] The board did not find abandonment either because of the twenty-one month gap between the demonstration and the filing date of Kresock's application or because of the dismantling of the Kresock circuit after the demonstration. Viewing the record as a whole, the board found that there was no substantial evidence to indicate an intent to abandon the invention. On the contrary, it found Kresock's writing of a patent disclosure in July, 1969, to be an affirmative act rebutting any presumption of abandonment. RCA argued before the board that Magnavox was spurred into filing Kresock's application after learning of the RCA circuit. The board, how-

ever, found that there was no substantial evidence that Magnavox was spurred by RCA's activities or that it suppressed or concealed the invention. It therefore awarded priority of invention to Kresock.

During the course of the interference Cochran petitioned the board for discovery under 37 CFR 1.287(b) and (c) for, inter alia, documents relating not only to the particular circuit involved in this interference, but also other flesh correction circuits that Kresock and his employer Magnavox were working on in the time period July, 1968, to May, 1970, arguing that the evidence sought would bear on the *issues* of the interference. The board granted Cochran's motion only to the extent that discovery was permitted of documents which related to the subject matter defined in the interference counts.

### OPINION

Three issues are presented in this appeal for our consideration. First, did the board err in holding that the August 23, 1968, demonstration of Kresock's circuit was an actual reduction to practice? Second, if we find an actual reduction to practice, did the board err in finding that Cochran had not met his burden of proving that Kresock had abandoned, suppressed, or concealed the invention? Third, did the board err in limiting the scope of discovery sought by Cochran under 37 CFR 1.287(b) and (c)?

### Kresock's Alleged Reduction to Practice

It is not disputed that Kresock did in fact demonstrate a circuit corresponding to the counts of the interference to Magnavox personnel on August 23, 1968. Appellant argues that this demonstration did not amount to a reduction to practice of the invention.

Appellant in particular criticizes the testing performed on the Kresock circuit

---

5. 35 U.S.C. § 102(g) provides in pertinent part:
 A person shall be entitled to a patent unless—
 \* \* \* \* \* \*
 (g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.

because the circuit was not evaluated for performance under conditions of practical use. He points out that flesh errors can be introduced by perturbations in the transmission path and by mistuning of the receiver's local oscillator. He also notes that flesh errors can differ from channel to channel, over periods of time, with differences in picture tube phosphors, with aging of parts, and with warmup of the receiver. He argues that the testing performed on the Kresock circuit could not determine how the circuit would handle these problems.

■ The evidence establishes that at the demonstration several commercially available receivers were present. Two were fitted with flesh correction circuits. One of the circuits was the Kresock circuit, the other was a so-called "gated" or "expander" circuit. As previously stated, several sources of color signals were available for the demonstration, including live or off-the-air signals. Those present at the demonstration observed improved flesh colors on the receiver fitted with Kresock's circuit, when it was switched in circuit, over a range of ± 30° of phase errors. We believe that this testing of the Kresock circuit was sufficiently related to conditions expected in actual use to establish that the circuit was capable of achieving its intended flesh correction result for the type of phase errors which were expected to be encountered in everyday use. *Gellert v. Wanberg*, 495 F.2d 779, 181 USPQ 648 (CCPA 1974). As appellee points out, the Kresock circuit was never designed to correct for all possible causes of flesh errors, but only for those associated with phase errors existing between the reference burst signal and the subcarrier signal. The testing performed on Kresock's circuit showed that the circuit was suitable for this purpose. Appellant would appear to require a testing of the Kresock circuit for reliability, over a period of time, under adverse conditions. While such testing may be desirable before the circuit could be commercially introduced, such extensive testing is not required for a reduction to practice. *Steinberg v. Seitz*, 517 F.2d 1359 (CCPA

1975); *In re Dardick*, 496 F.2d 1234 (CCPA 1974).

Appellant further argues that the demonstration failed to carry a conviction of the success of Kresock's circuit because the circuit degraded the reproduction of particular colors, most notably green, while correcting flesh colors. As evidence on this point appellant refers to a progress report written by Heffron, Kresock's superior, a witness to the demonstration. This report stated that a "noticeable lack of green reproduction was observed" when the Kresock circuit was employed and that work would continue on this approach "to increase green reproduction." A later written memorandum by Heffron stated:

> While flesh colors have been acceptable for errors of ± 20 degrees, in each instance the green colors have been desaturated and reproduced as blue rather than green. Further investigation is required.

These writings were further explained by Heffron in his testimony. He stated that he did not mean by these writings that the Kresock circuit did not function as intended, but, rather, that further work was needed to achieve the optimum balancing of the tradeoff which exists in all flesh correction circuits between proper flesh color and proper background color.

■ Our review of the evidence convinces us that the Kresock circuit did achieve its goal of producing flesh tone correction, and that all that remained to be done after the August 23, 1968, demonstration was the optimization of the inherent trade-off between acceptable flesh color and acceptable background color. A reduction to practice does not require that the invention be perfect or incapable of further improvement. *Land v. Regan*, 342 F.2d 92, 52 CCPA 1048 (1965).

Appellant further argues that the subsequent dismantling and discontinuance of work on the Kresock circuit shows that the demonstration of the Kresock circuit was no more than an abandoned experiment. Appellant notes that the

392

first color correction circuit commercially introduced by Magnavox was not Kresock's relatively low cost circuit, but, rather, the so-called "flesh expander," a high cost deluxe circuit. He further notes that Heffron testified that in August, 1969, Magnavox began work on another so-called "low cost" flesh correction circuit which was different from the Kresock circuit. These facts, appellant contends, support an inference that the demonstration was never more than an abandoned experiment.

 We believe the introduction by Magnavox of the "flesh expander" circuit is irrelevant to the question of whether Kresock's demonstration was an abandoned experiment. That circuit, as the evidence shows, was a deluxe high cost circuit designed to accentuate Magnavox's entry into the flesh correction field. The Kresock circuit on the other hand was a low cost circuit which was designed to provide a less sophisticated flesh correction at a lower cost for later market introduction, after Magnavox had established a name for itself in the flesh correction area. Since the deluxe circuit was designed for an entirely different purpose, its existence does not show that Magnavox abandoned work on the Kresock circuit after the demonstration. Nor do we believe that the possible existence of other low cost circuits, without more, creates an inference that the Kresock demonstration amounted to an abandoned experiment. We believe it is unreasonable to conclude that Kresock's circuit was discarded because development work was progressing on several alternative approaches to flesh correction.

 With respect to the subsequent dismantling of the Kresock circuit, it is noted that relatively few components are involved in the circuit so that, if necessary, the circuit could be readily reconstructed from the circuit diagram existing in the laboratory notebooks. In addition, the evidence shows that the components used by Kresock were removed from the receiver so that the receiver could be put to other uses. We cannot draw an inference that the Kresock demonstration was an abandoned experiment from the dismantling of the circuit under these circumstances. Furthermore, a contrary inference could also be deduced from these facts, namely, that the work on the Kresock circuit was complete.

Additionally, we find that the fact that Kresock was given the go-head to write a patent disclosure on his circuit effectively rebuts any inference that the Kresock demonstration was an abandoned experiment. We, therefore, find on the facts before us that Kresock has established an actual reduction to practice on August 23, 1968.

### Abandonment, Suppression, or Concealment

 On the issues of abandonment, suppression, or concealment the party asserting these matters (here the senior party-appellant) bears the burden of proof by a preponderance of the evidence. *Young v. Dworkin*, 489 F.2d 1277 (CCPA 1974); *Gallagher v. Smith*, 206 F.2d 939, 41 CCPA 734 (1953).

As we stated earlier, the evidence before us indicates that after the demonstration, the Kresock circuit was dismantled in September, 1968. Thereafter, little or no work was done on the Kresock circuit. Kresock was given the go-ahead to prepare a patent disclosure which he completed in July, 1969, and submitted to Knauer, the chief engineer of the color TV department. That disclosure was held by Knauer from July, 1969, until April 1–3, 1970, at which time the Magnavox patent committee decided to file an application on the Kresock circuit. There is no evidence which indicates the reason Knauer held the disclosure for this period of time. Prior to the April 1–3, 1970, patent committee meeting it was reported in the March 16, 1970, edition of the trade magazine *TV-Digest* that RCA was commercially introducing a flesh correction circuit. No details of the RCA circuit were given in this article. The article also confirmed that prior to the time of its publication Magna-

vox, Philco-Ford, and Admiral all had commercially introduced flesh correction circuits. There is evidence before us which indicates that at least some of those present at the Magnavox patent committee meeting had general knowledge that RCA was introducing a flesh correction circuit. The evidence fails to show, however, whether anyone at the patent committee meeting had specific knowledge of any of the details of the RCA circuit, although such detailed knowledge was acquired by some of those present at the meeting shortly thereafter.

Appellant argues that the dismantling of the Kresock circuit and lack of activity on the circuit, coupled with the fact that Magnavox began work on at least one other "low cost" flesh correction circuit in August, 1969, prove that Magnavox abandoned the Kresock circuit subsequent to the demonstration. As we stated, supra, with respect to appellant's contention that Kresock's demonstration was an abandoned experiment, we cannot agree. There is no evidence before us which clearly indicates any abandonment of the Kresock invention. The mere lapse of time between the dismantling of the Kresock circuit in September, 1968, and the patent committee meeting in April, 1970, does not evidence an intent to abandon the invention. Similarly, we believe that work on other "low cost" flesh correction circuits by Magnavox does not lead to an inference that the Kresock circuit was abandoned. Moreover, this evidence must be contrasted with the undisputed fact that in June, 1969, Kresock was assigned the task, completed in July, 1969, of preparing a patent disclosure on his invention. It appears illogical to us that if the Kresock circuit was truly abandoned, at least as of July, 1969, Kresock would have ever been assigned the task of drafting a patent disclosure. Similarly, the later review of this patent disclosure by the patent committee, with the subsequent filing of an application, creates a strong inference that no abandonment took place after the submission by Kresock of the patent disclosure in July,

1969. There is also direct testimony by Heffron to the effect that there was never any intention on the part of Magnavox to abandon Kresock's circuit, but on the contrary that at some point in time the circuit was to be incorporated into a commercial receiver. Considering all the evidence before us, we conclude that there is lack of proof, by a preponderance of the evidence, that the Kresock circuit was abandoned after the actual reduction to practice.

Appellant also contends that the Kresock circuit was suppressed and concealed by Magnavox because of the lack of activity between the July, 1969, patent disclosure and the April 1–3, 1970, patent committee meeting and because Magnavox only decided to file an application on the Kresock circuit after being spurred by the commercial introduction of a flesh correction circuit by RCA. As support for his "spurring" contention appellant relies on the March 16, 1970, edition of *TV-Digest* which discusses the introduction by RCA of a flesh correction circuit. Although the article gives no details of any specific circuitry, the record shows that at about the same time as the patent committee meeting, some personnel at Magnavox had complete details of the RCA circuit. There is no evidence of record, however, that those present at the patent committee meeting knew of the details of the RCA circuit when a decision to file an application on Kresock's circuit was made. In addition, the article establishes that the entrance of RCA into the flesh correction market was preceded by Magnavox, Philco-Ford, and Admiral, and, therefore, that RCA was in fact a latecomer to this technology.

The delay on the part of Magnavox in bringing the Kresock patent disclosure before the patent committee is not a controlling factor on the issue of suppression or concealment. Mere delay, without more, is insufficient. *Young v. Dworkin*, supra. Rather, the total conduct of the inventor and his corporate employer must be examined before we can decide whether the Kresock inven-

tion was suppressed or concealed. However, there is no substantial evidence concerning the activities of Kresock or Magnavox between the time the patent disclosure was prepared in July, 1969, and the April, 1970, patent committee meeting. Appellant's whole case, therefore, rests on an inference of suppression or concealment based on the alleged spurring of Magnavox by RCA.

■ The evidence to which appellant points as support for his spurring contention is insufficient to establish an inference of suppression or concealment. As stated above, the evidence shows that at least three manufacturers already had commercial flesh correction circuits before RCA introduced its circuit. Such a state of affairs tends to lessen the likelihood that Magnavox was spurred into activity by a general information article describing the belated entrance of RCA into this field. The only other evidence which might tend to support appellant's spurring argument is the knowledge by some of the Magnavox personnel of the details of the actual circuit used by RCA. This knowledge was acquired at about the time of the patent committee meeting. However, the evidence fails to show that anyone present at the meeting knew of the details of the RCA circuit when a decision was made to file an application on Kresock's invention. In fact, the only witness present at that patent committee meeting who was called by appellant, a Mr. Seeger, testified that he did not know of the details of the RCA circuit at the time of the meeting. Therefore, on the facts before us, we cannot conclude that appellant has proven by a preponderance of the evidence that Magnavox had suppressed or concealed the invention and was spurred into filing Kresock's application only after learning of the RCA introduction of a flesh correction circuit. The inference which appellant seeks to draw from the evidence is weak and fails to measure up to the proof required on this issue.

### Discovery

To facilitate our discussion of this issue we reprint relevant portions of appellant's motion for discovery brought under Rule 287(b) and (c), followed by the relevant portions of the board's decision on the discovery motion.

### The Motion

\* \* \* \* \* \*

*Documents and Things to be Produced*

All documents and things in the possession, custody or control of John M. Kresock, Charles B. Heffron, Harry L. Marshall, or Magnavox within any of the categories set forth below.

1. All progress reports by (a) John M. Kresock and Harry L. Marshall to Charles B. Heffron and (b) by Charles B. Heffron to Paul E. Knauer, for the period from July, 1968 to and including May, 1970, relating or referring to the construction, testing, comparison and/or analysis of color television receiver flesh control circuitry *including, without limitation, the invention in issue.*

2. All notebook entries by (a) Marshall for the period of July through September, 1968, (b) Heffron for the period from August 23, 1968 through September, 1969, and (c) Kresock for the period from August 23, 1968 to May 25, 1970, relating or referring to the construction, testing, comparison and/or analysis of color television receiver flesh control circuitry *including, without limitation, the invention in issue.*

3. All documents and things prepared prior to May 25, 1970, relating or referring to the commercial introduction by RCA of its color television receiver chassis CTC39X or otherwise evidencing knowledge by Magnavox of RCA's commercial introduction of color television receivers embodying flesh control circuitry.

4. All documents and things prepared prior to May 25, 1970, relating or referring to the Kresock patent disclosure (Exhibit K–11) or to its subject matter, passing between Kresock, Heffron, Knauer or Magnavox, on the one hand, and Magnavox's patent attorneys, on the other hand, or prepared

by one or more of Magnavox's patent attorneys.

\* \* \* \* \* \*

[Our emphasis.]

### Board Opinion

\* \* \* \* \* \*

It is not intended, however, that orders under Rule 287(c) will issue as a matter of course in any interference where testimony is to be taken. Rather requests for such orders should be limited to items which are necessary and cannot be obtained under Rule 287(b) and where the showing of facts and circumstances presented in support of the request are specified with particularity.

Here Cochran has stated and it is not contradicted, that the "testimony seems to show that following August, 1968, Kresock dismantled the flesh control circuits from the color television receiver chassis in which he is said to have tested the invention and that he did nothing further thereafter with respect to the invention other than the preparation of his patent July, 1969 disclosure." In view of that statement we believe that the interests of justice require that Cochran should obtain under Rule 287(c) additional discovery relating to the invention in issue which may tend to explain the reasons why the circuits were dismantled and nothing further was done until July, 19, 1969.

\* \* \* \* \* \*

However, the request for discovery by Cochran is considered too broad. The mere possibility that the work on the other circuits referred to may adversely affect the invention in issue is not regarded as justification for granting discovery relative to such circuits. For the foregoing reason the motion of Cochran is granted only to the extent that it is hereby ordered that on or before twenty days from the date of the order, Kresock shall make available to the party Cochran for inspection and copying all documents and things in the possession, custody or control of John M. Kresock, his assignee Magnavox Corporation or its employees which fall within the four categories specified in the Cochran motion insofar as they are directed to the invention defined in the counts of the interference.

\* \* \* \* \* \*

Although appellant's motion was brought under both paragraphs (b) and (c) of Rule 287, the board apparently treated the motion as being brought solely under Rule 287(c). 37 CFR 1.287, paragraphs (a), (b) and (c), in relevant part, state:

(a)(1) Each party who expects to take testimony must serve on each opposing party who requests service the following:

(i) A copy of each document in his possession, custody, or control and upon which he intends to rely,

(ii) A list of and a proffer of reasonable access to things in his possession, custody, or control and upon which he intends to rely, and

(iii) A list giving the names and addresses of all persons whom he intends to call as witnesses and indicating the relationship of each person to the invention in issue.

\* \* \* \* \* \*

(b) The provisions of paragraph (a) of this section are without prejudice to the right of a party, where appropriate, to obtain production of documents or things during cross-examination of an opponent's witness or during his own period for rebuttal testimony.

(c) Upon motion (§ 1.243) brought by a party during the period for preparation for testimony, or thereafter as authorized under § 1.245, and upon a showing that the interest of justice so requires, the Board of Patent Interferences may order additional discovery as to matters under the control of a party within the scope of the discovery rules of the Federal Rules of Civil Procedure, specifying the terms and condi-

tions of such additional discovery. An order by the Board granting or denying a motion under this paragraph shall not be subject to review prior to a decision awarding priority.

Although it is not clear from Rule 287 what relationship paragraph (b) has to paragraphs (a) and (c), we believe that discovery under paragraph (b) must be limited to specific documents or things which were somehow introduced during testimony in an opponent's case but which were not previously provided to the party seeking discovery under paragraph (a) of the rule. Appellant's motion for discovery did not state that discovery was sought for a particular document or thing introduced in appellee's case. Therefore, we believe that the board was correct in treating appellant's motion as one for additional discovery under 287(c).

Paragraph (c) of Rule 287 states that the additional discovery provided by the paragraph *may* be granted by the board. It is therefore clear that the discovery sought by appellant is not a matter of right, but rather is discretionary with the board. We do not ordinarily interfere in matters which are discretionary within the Patent and Trademark Office unless there has been a clear showing of abuse of that discretion. *Cook v. Dann, Comm'r of Pats.*, 522 F.2d 1276 (CCPA 1975); *Schenley Industries, Inc. v. E. Martinoni Co.*, 408 F.2d 1049, 56 CCPA 1038 (1969).

Appellant argues that the scope of discovery granted by the board was inadequate because it excluded relevant evidence relating to the issues of the interference. For example, appellant points out that information on the development work on other low cost flesh correcting circuits would tend to prove appellant's contention that Kresock's circuit was in fact abandoned. Appellant also argues that evidence which would tend to support the inference that the Kresock invention was suppressed or concealed was excluded due to the narrow scope of discovery granted.

As noted supra, the discovery request was not directed to any particular documents or things relating to any particular flesh correction circuits on which Magnavox was working. Rather, the request was for all progress reports and all notebook entries dealing with any other flesh correction circuits under development by Magnavox. The information requested was proprietary and involved technology which was directly competitive with technology being developed by RCA. The motion for discovery was in effect a request that Magnavox hand over to RCA all its trade secrets dealing with flesh correction circuits. The board was, therefore, faced with the problem of balancing the need of RCA to prove its case with the right of Magnavox to protection of its proprietary information. In addition, the record indicates that concerning at least one of the flesh correction circuits, the so-called "green null approach," a different interference was pending between the same parties to this interference. We feel that under the circumstances of this case, the board acted within the discretion provided it by Rule 287(c) in limiting the scope of discovery sought. This is not to say that in all cases proprietary information is not discoverable. Each case must be decided on its own facts.

Moreover, appellant cannot now claim that he was unduly prejudiced by the board's action. It is clear from the record before us that appellant could have cross-examined Heffron or examined other witnesses concerning the development of other flesh correction circuits by Magnavox. Appellant in fact did elicit testimony from Heffron on the existence of several flesh correction circuits referred to by Heffron as the "green null approach," the "flesh expander," and the "swept automatic hue" as well as Kresock's circuit. We do not perceive how the specific details of these circuits are crucial to proving appellant's case. In addition, appellant could have elicited testimony directly on the question of abandonment, suppression, or concealment by examining Knauer on

why he held Kresock's patent disclosure from July, 1969, until the patent committee meeting, or by examining the others present at the patent committee meeting concerning any knowledge they may have acquired relating to the commercial introduction of the RCA circuit in March, 1970.

### Conclusion

Accordingly, we conclude that the decision of the board must be *affirmed.*

*Affirmed.*