Joseph A. KERSAVAGE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 91–1233 C.

United States Court of Federal Claims.

July 24, 1996.

John D. Lockridge, Knoxville, Tennessee, for plaintiff.

Edward H. Rice, with whom were Vito J. DiPietro, Director, Commercial Litigation Branch, Civil Division, and Frank W. Hunger, Assistant Attorney General, Department of Justice, Washington, DC, for defendant.

## OPINION

SMITH, Chief Judge.

This case is a patent infringement suit in which plaintiff alleges that the government infringed plaintiff's patented method of building protective shelters for the military. Before the court is defendant's motion for summary judgment, and three motions by plaintiff to supplement its response to defendant's motion for summary judgment.

### FACTS

Plaintiff, Joseph A. Kersavage, is a Professor of Architecture at the University of Tennessee (UT), and the named inventor of two United States Letters Patent. The plaintiff alleges the government has infringed these patents. Both patents disclose methods of building protective shelters to withstand great impact from natural and man-made disasters, such as earthquakes, tornados and bombs.

The first patent, number 3,927,496, was issued in 1975 (the 1975 patent). The 1975 patent discloses a "Method for Constructing a Tensile–Stress Structure and Resultant Structures." Plaintiff defines a "tensile-stress" structure as one "that resolves applied forces by acting mainly in tension

(elongation) rather than in compression (foreshortening) or shear (cross-cutting), or a combination of stresses." The patent uses a hyperbolic paraboloid (hypar) to create a tent-like structure which can withstand large quantities of pressure by functioning similarly to a hammock.

The second patent, number 4,651,479, was issued in 1987 (the 1987 patent). The 1987 patent discloses a "Protective Structural Module and Method for Construction" in which special supporting materials are placed inside and outside the hypar structure to increase its ability to withstand pressure.

In 1980, UT Research Associate Professor Thomas F. Moriarty suggested that he and plaintiff seek funding from the U.S. Department of Defense to continue plaintiff's research. In December 1982, the Air Force awarded Professor Moriarty and plaintiff contract number F08635–83–6–0057, (the '057 contract), to develop bomb shelters using the hypar design disclosed in plaintiff's 1975 patent. Under the '057 contract, Professor Moriarty and plaintiff built models to test the designs of the hypar structures. Three scale models were tested successfully and the investigators recommended a full-scale blast test using the hypar structure.

In September 1984, Professor Moriarty and Peter von Buelow, a student of plaintiff's who assisted with the '057 contract, entered into a second contract with the Air Force to continue the research on hypar structures. During the second contract, contract number F08635–85–C–0035 (the '035 contract), Professor Moriarty and Mr. von Buelow constructed and tested a prototype full-scale hypar protective structure using plaintiff's hypar patent designs. Plaintiff withdrew his consent to the use of his patents after the full-scale tests, on October 25, 1985.

In May 1986, Professor Moriarty and Mr. von Buelow, without plaintiff, began a third Air Force contract, F096355–86–C–0108 (the '108 contract), which continued the work with hyperbolic paraboloid shell structures. Plaintiff did not participate nor did he consent to the use of his patents for continued research under the '108 contract.

In December 1986, the University of Tennessee entered into a contract with the Navy (the Navy contract) for the development of expeditionary shelters for the Marine Corps. Professor Moriarty and Mr. von Buelow were the investigators. The contract consisted of three phases: design exploration, design development and structural analysis, and prototype construction. The Navy put a hold on the contract after phase two and UT never constructed prototypes of the proposed designs under the Navy's direction.

This case originated as a patent infringement suit filed by plaintiff against Professor Moriarty and Peter von Buelow on December 21, 1988, in the U.S. District Court for the Eastern District of Tennessee. Plaintiff did not originally name the United States as a defendant. The District Court invited plaintiff to move to amend his complaint to add the United States as a party. On April 8, 1991, the District Court granted plaintiff's motion and ordered the case transferred to the U.S. Court of Federal Claims.

The government alleged that it never was served with plaintiff's "Amendment to Complaint," nor with the original complaint. On August 9, 1991, the U.S. Court of Federal Claims dismissed the action, after plaintiff's then attorney of record, Stanely G. Emert, Jr., failed to respond to three consecutive orders to file plaintiff's complaint and comply with other provisions of the court's rules. On March 19, 1992, plaintiff, through different counsel, filed a Motion for Relief from Judgment, which this court granted. The court dismissed the remaining defendants in this action, Thomas F. Moriarty and Peter von Buelow. The government filed a motion for summary judgment and the court held oral argument.

Plaintiff filed three separate Motions for Leave to Supplement its Response to defendant's motion for summary judgment. On July 18, 1994, plaintiff filed its first motion which included an attached document titled "The University of Tennessee School of Architecture Fall Semester Lecture Series (November 9, 1988)—Peter von Buelow, Research Professor in Architecture, UTK—The

Modularch System.[1]" Plaintiff filed this document as evidence contradicting Professor von Buelow's statement and the government's position that the Navy cancelled its contract with UT before prototype construction. The document stated that "[a] prototype of the Modularch, a modular structural system which has spawned from this work, is currently being built at the University of Tennessee." Defendant filed an opposition to the admission of the lecture description contending that the document was inadmissible hearsay.

Plaintiff filed its second motion on November 16, 1994, which consisted of further arguments, two affidavits by plaintiff and photographs of the structure built during the '108 contract. Defendant filed a response, opposing the admission of plaintiff's supplementary material and contesting plaintiff's most recent arguments. On January 31, 1995, plaintiff filed its third Motion for Leave to File "Late Filed" Exhibits which sought to cure defects in its earlier submissions.

## I. PRELIMINARY MOTIONS

In plaintiff's motions to supplement the summary judgment record and motion for leave to file "late filed" exhibits, plaintiff asks the court to permit corrections to the record and to consider further argument and evidence. The Federal Rules of Civil Procedure enable the court in its discretion to extend the time for filings. FRCP 6(b). Courts are hesitant to permit late filing of materials to avoid unfair prejudice to the opposing party. *See, e.g.,* 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed.Prac. & Proc.Civ.2d* § 1487 (1990) and cases cited therein. *See also Engelhard Industries, Inc. v. Research Instrumental Corp.,* 324 F.2d 347 (9th Cir.1963) *cert. denied* 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964). Courts, however, are more permissive when late filed material merely addresses technical deficiencies and does not attempt to introduce new arguments or evidence. *Id.*

The court recognizes the inherent difficulties with allowing plaintiff to file its new submissions. Late filings may disadvantage the opposing party. Defendant did not have the late material when defendant submitted its affidavits, nor did defendant have the opportunity to address all the late materials at oral argument. The court, however, allowed defendant to file oppositions to all late materials filed by plaintiff. *See, e.g., United States v. Witmer,* 835 F.Supp. 201, 204 (M.D.Pa.1993) *vacated in part on reconsideration by* 835 F.Supp. 208 (M.D.Pa.1993) *aff'd by* 30 F.3d 1489 (3rd Cir.1994).

### A. Photographs and Affidavits

■ In its motion for summary judgment, defendant objected to plaintiff's affidavits and photographs submitted to demonstrate infringement of plaintiff's patent during the '108 contract. Defendant objected to the submission of plaintiff's photographs arguing that plaintiff failed to provide admissible evidence to support the affidavits. Defendant claims that plaintiff does not have personal knowledge regarding the construction under the '108 contract and thus cannot satisfy the evidentiary requirements pursuant to RCFC 56(f). Defendant argues that plaintiff's testimony lacks corroboration, is conclusory, and does not raise a genuine issue of material fact that would preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Plaintiff filed the second supplementary filing, which included plaintiff's most recent affidavit and photographs, to demonstrate that the work performed under the '108 contract violated plaintiff's 1975 patent. Plaintiff filed its third supplementary filing as an attempt to defeat defendant's objection to the submission of plaintiff's second supplementary filing for lack of adequate authentication.

The court may consider as admissible evidence plaintiff's photographs if the photographs are properly authenticated pursuant to Rule 901 of the Federal Rules of Evidence. To satisfy FRE 901, the plaintiff

---

1. Peter von Buelow, a former student of Professor Moriarty, also became a research professor at the University of Tennessee.

must provide evidence "sufficient to support a finding that the matter in question is what its proponent claims." FRE 901.

The court allowed plaintiff to submit three affidavits to satisfy the authentication requirement pursuant to FRE 901. Rule 56(f) of the United States Court of Federal Claims requires that all affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall demonstrate that the affiant is competent to testify regarding the matters alleged. The court may permit affidavits to be supplemented.

Plaintiff submitted two affidavits by Dr. Kersavage and one affidavit by Brett Honeycutt, a student employee of Professor von Buelow. Dr. Kersavage's affidavits explain that the photographs attached to his supplementary filing identify construction under the '108 contract using Dr. Kersavage's hypar structures in violation of his 1975 patent. In neither affidavit, however, does Dr. Kersavage testify that these photographs reflect personal knowledge of construction based upon his direct observation. Thus, these affidavits fail to satisfy the personal knowledge condition of RCFC 56(f) and, therefore, fail to adequately identify the photographs pursuant to FRE 901.

Plaintiff then supplied this court with the affidavit of Mr. Honeycutt as an attempt to provide the court with personal knowledge of what the photographs purport to demonstrate. The relevant portion of Mr. Honeycutt's affidavit states:

> I am familiar with the photographs attached as part of Exhibit C ... Mr. von Beulow [Buelow] provided the photographs to me which are the subject of this Affidavit, at my request, during March of 1988. Earlier during the summer of 1986, I worked, for a period of several months, as a student laborer under Peter von Beulow [Buelow].

The affidavit suggests that Mr. Honeycutt received the pictures at the time of issue. Mr. Honeycutt's affidavit, however, fails to provide support for Dr. Kersavage's testimony. Mr. Honeycutt, importantly, does not

assert that the photographs are of a hypar structure constructed under the '108 contract using Dr. Kersavage's 1975 patent. In fact, Mr. Honeycutt's affidavit provides no information regarding what the photographs portray. The court finds, therefore, that Mr. Honeycutt's affidavit, pursuant to FRE 901 and RCFC 56(f), is insufficient to identify the photographs as a completed hypar structure in violation of Dr. Kersavage's 1975 patent.

The court finds that the Dr. Kersavage's and Mr. Honeycutt's affidavits do not provide an adequate foundation to allow the photographs into evidence. The court also notes that, even if the photographs were admissible, they are of little persuasive value because the pictures are vague and do not show a completed structure using the hypar technology.[2]

### B. Newspaper Pictures & Lecture Flyer

■ Defendant contends that plaintiff cannot provide the threshold factual foundation needed to defeat defendant's motion for summary judgment regarding the Navy contract. First, defendant argues that the newspaper photographs submitted by plaintiff in its response to defendant's motion for summary judgment lack proper authentication and cannot be admitted into evidence as proof of construction under the Navy contract. Defendant argues that plaintiff's affidavit regarding the alleged infringement under the Navy contract does not satisfy Rule 56(f) because plaintiff did not participate in the Navy contract and has no personal knowledge about work performed under that contract.

To prove that defendant began construction under the Navy contract in violation of plaintiff's patent, plaintiff submitted a copy of photographs in the University's school newspaper. Plaintiff argued that these pictures contradicted defendant's denial of construction under the Navy contract. Plaintiff provided an affidavit of his testimony that he personally witnessed the structure constructed under the Navy contract and that these photographs provided further evidence of the

2. See Appendix A for a copy of the submitted photographs.

beginning of construction under the Navy contract.

Defendant argues that such pictures are inadmissible because of a lack of proper foundation. Defendant asserts that plaintiff did not participate in the Navy contract, nor did he take the pictures used in the school newspaper, nor did he provide supporting affidavits by someone with personal knowledge of what the photographs show. Defendant further contends that even if the court admits the newspaper photographs, the photographs do not reflect the beginning of the construction of a prototype. Defendant argues that the photographs depict a partially assembled mock-up of a single hypar, used exclusively for making geometry study measurements.

The newspaper photographs must have adequate authentication to satisfy FRE 901(a). Plaintiff does testify in his affidavit that he has personal knowledge of construction under the Navy contract and that the newspaper photographs reflect such construction. After numerous opportunities to supplement his response, however, plaintiff failed to provide the court with an affidavit by the photographer or anyone else with personal knowledge of what the photograph portrays. The court finds that plaintiff's affidavit by itself does not provide an adequate foundation for admitting the newspaper photograph into evidence. The court also notes that, even if the photographs could be admitted, they are of little persuasive value because the pictures are vague and do not show a completed structure, but rather, a student measuring a panel.[3]

Plaintiff then filed its first supplement, an academic course description, to cure the defects noted by defendant. Plaintiff contends that a portion of the course description directly quotes Professor von Buelow admitting that a prototype was constructed using "tensile structure technology" in violation of plaintiff's 1975 patent. Plaintiff offers the course description to contradict Mr. von Buelow's affidavit that the University did not build a prototype under the Navy contract. Defendant argues that the course description

is hearsay and cannot be admitted into evidence.

Hearsay is an out of court statement offered for the truth of the matter asserted. FRE 801. The hearsay rule precludes written as well as oral out of court statements. *Id.* The course description qualifies as an out of court statement offered for the truth of the matter asserted. Plaintiff submitted the flyer to prove that the University did indeed infringe plaintiff's 1975 patent under the Navy contract. Plaintiff has failed to produce testimony or any documentation that the course description used Professor von Buelow's exact words. Professor von Buelow, however, testified in an affidavit that the flyer does not contain his own words or quotations and is not an accurate paraphrase of any statement that he made regarding the lecture. Mr. von Buelow explained that he did not retract the lecture description because the alleged misleading statement had no bearing on his lecture.

The court will consider the lecture flyer for impeachment purposes only. The court denies plaintiff's motion to consider the flyer as proof that the University built a prototype under the Navy contract. The court notes that even if the court permitted the flyer into evidence for this purpose, it would provide little support to plaintiff's case. Lecture flyers are not reliable sources of information. A university creates lecture descriptions to encourage students to attend a course. Plaintiff cannot prove that the flyer directly quotes Professor von Buelow. Furthermore, the exact words of the flyer do not strengthen plaintiff's argument. The flyer states that a prototype of the modular structural system was "spawned" from the work of Professor Moriarty and Professor von Buelow. The flyer never states that the University built the prototype under the Navy's direction.[4]

The court has considered defendant's opposition to the late filings, affidavits and newspaper photographs and finds that plaintiff has failed to adequately authenticate the photographs relating to the '108 contract and the newspaper photographs relating to the

---

3. See Appendix B for a copy of the submitted newspaper photographs.

4. See Appendix C for a copy of the lecture flyer.

Navy contract. The court stresses, however, that even if these photographs were considered admissable, they would have negligible persuasive value because of their lack of clarity regarding the subject of the pictures. The court will allow the course description to be considered solely for impeachment purposes.

## II. DISCUSSION

Rule 56(c) of the Rules of the United States Court of Federal Claims states that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party seeking to defeat a motion for summary judgment cannot rely on mere allegations to demonstrate the existence of material facts that would preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Supreme Court noted in *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Thus, the non-moving party must designate specific facts demonstrating a genuine issue for trial.

 Summary judgment is as appropriate in a patent infringement case, as in any other type of civil case, when the moving party has demonstrated that no genuine issue of fact exists and that the moving party is entitled to judgment as a matter of law. *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir.1987). *See also Davies v. United States*, 31 Fed.Cl. 769, 773–74 (1994). The court shall find summary judgment in favor of the defendant if the defendant proves that he had a license to use the patent at the time of the accused infringement. *Davies*, 31 Fed.Cl. at 773; *see also Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*, 16 F.3d 394, 397 (Fed.Cir.1994). The defendant also is entitled to summary judgment if the defendant can prove that one of the claim limitations described in the pat-

ent was not present in the accused apparatus. As claim interpretation is a question of law, differing opinions by opposing parties as to the meaning of claim language used in a patent description does not preclude summary judgment. *Howes*, 814 F.2d at 643; *see also Davies*, 31 Fed.Cl. at 773–74.

Plaintiff claims that he is entitled to compensation under 28 U.S.C. § 1498(a) for patent infringement of his 1975 and 1987 patents. Section 1498(a) provides compensation to a patent owner for the government's manufacture or unauthorized use of a patented invention "without license of the owner thereof or lawful right to use or manufacture the same."

Defendant claims that it has a nonexclusive, irrevocable license to use the 1987 patent because the patent was first reduced to practice under the '057 and '035 contracts with the Air Force. Defendant also argues that it did not infringe the 1975 patent under the '057 and '035 contracts because plaintiff gave permission for its use during the relevant periods at issue. Defendant also contends that it did not infringe the 1975 patent during the '108 contract because the prototype did not use any technology described in the 1975 patent. Finally, defendant argues that it did not infringe the 1975 patent under the Navy contract because the University did not build a prototype under the contract, and if the University did build a prototype, it was without government authorization and, therefore, defendant cannot be liable for infringement.

### A. The 1987 Patent

 Defendant claims that it has a nonexclusive, irrevocable license to practice the invention disclosed in plaintiff's 1987 patent because the patent discloses an invention which defendant actually first reduced to practice under the '057 and '035 Air Force contracts. Plaintiff conceded at oral argument that he had no infringement claim under the '057 contract due to his consent to the use of his patent throughout the '057 contract period. This court must determine if defendant infringed plaintiff's patent under the '035, '108 and Navy contracts.

Defendant claims that because plaintiff consented to the use of the 1987 patent during the relevant portion of the '035 contract, plaintiff cannot now claim that defendant infringed plaintiff's patent. Before addressing the alleged infringement, the court must first determine whether defendant holds a license to use the 1987 patent based upon the work performed under the '035 contract before plaintiff withdrew his consent.

The United States Court of Claims and the United States Court of Federal Claims traditionally have construed this type of government research contract liberally in favor of finding a license in the government's behalf. Research contracts intentionally utilize broad language to ensure the government a license to use, without further payment, inventions, improvements and ideas which were spawned or created through government-financed research. In *Technitrol, Inc. v. United States*, 194 Ct.Cl. 596, 440 F.2d 1362 (1971), the Court of Claims stated that:

> What *Mine Safety* teaches is that the issue of license *vel non* should be approached liberally by asking what the United States (acting for its taxpayers) can fairly be said to have purchased through its sponsorship of the contract project. The Federal government has the right to use, royalty-free, those ideas, improvements, discoveries, and inventions—crystallized during performance of the federal contract—which have a "close and umbilical relationship" to the work and research funded by the United States. Having borne the expense of that effort, the public is entitled to enjoy the fruits without further charge.

*Id.* at 613, 440 F.2d at 1372. *See also Mine Safety Appliances Co. v. United States*, 176 Ct.Cl. 777, 364 F.2d 385 (1966).

Plaintiff argues that the liberal standard for interpreting government research contracts relates solely to the scope of the invention created under or because of the contract. Plaintiff contends that the "close and umbilical relationship" discussed in *Technitrol* should be limited to whether a particular invention so resembles the stated aims of a

particular research contract that equity dictates that the government receive a license for the use of the invention—even if the invention was not technically created under the contract.

The court declines to interpret *Technitrol* and *Mine Safety* as narrowly as plaintiff suggests. The government finances research contracts to earn the benefit of the research without paying further royalties to the inventor. The contracts specifically state the conditions which must be met for the government to receive a license to use the invention royalty-free. In preserving the purpose of government-financed research, this court shall interpret the conditions for a license liberally and discount minor dissimilarities between the 1987 patent and the '057 and '035 Air Force research contracts. To do otherwise would be to create a rule difficult to administer and productive of litigation.

Both the '057 and '035 contracts contain standard licensing clauses that grant the government a nonexclusive, irrevocable license to practice any invention conceived or actually reduced to practice under the contract.[5] The court must determine that the government has satisfied each condition of the licensing terms to find a license for the use of the 1987 patent by the government. The licensing clauses contain three conditions for the creation of a license by reduction to practice: (1) that the contract invention be the same as the patented invention; (2) that the contract invention actually be reduced to practice by the contractor; and (3) that the contractor's first actual reduction to practice take place under the contract.

The court finds that defendant satisfies the first requirement for a license to use the 1987 patent. In defendant's "proposed findings of uncontroverted fact," defendant claims that the structures built and tested under the '035 and '057 contracts are the same as the structure claimed in the 1987 patent. Although plaintiff does not affirmatively concede this point, plaintiff effectively concedes that the contract invention and pat-

---

**5.** Defendant does not claim that the invention claimed in the 1987 patent was first conceived under the government contracts.

ent invention are the same by failing to dispute defendant's declaration. RCFC 56(d)(2) and (3); *see also Circle K Corp. v. United States,* 23 Cl.Ct. 659, 663 (1991).

The court also notes that the structural module claimed in the patent essentially is identical to the structures built and tested under the '057 and '035 contracts. Every claim limitation and every graphic illustration used in the 1987 patent application appear in the 1984 interim report for the '057 contract. The 1987 patent also describes the blast tests performed under the '035 contract to demonstrate that the 1987 patent invention does protect shelters from blasts. Considering all the similarities between the structures built and tested by the government and the patent, the court finds the two inventions to be identical.

The second and third requirements are interrelated. For the government to acquire a license for use of the 1987 patent, the contract invention actually must be reduced to practice by the contractor and such reduction by the government must be the first time the invention is actually reduced to practice. The Court of Claims held that the amount of proof required to establish "actual reduction to practice" is whether the constructed device demonstrates that the patented invention "will perform its intended function beyond a probability of failure." *See McDonnell Douglas Corp. v. United States,* 229 Ct.Cl. 323, 329, 670 F.2d 156, 161 (1982) *citing General Electric Co. v. United States,* 228 Ct.Cl. 192, 204, 654 F.2d 55, 62 (1981).

 The government must satisfy two conditions to meet the burden of proof of actual reduction to practice of the 1987 patent. First, the physical embodiment of the invention must include all limitations in the claims. The claims are the framework of the patent invention and reduction to practice occurs only if the physical creation conforms to each claim. *See, e.g., Standard Mfg. Co., Inc. v. United States,* 25 Cl.Ct. 1, 63 (1991) *citing Electronics Co. v. United States,* 816 F.2d 647, 652 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748 98 L.Ed.2d 761 (1988). Second, reduction to practice transpires only when the contractor builds the device and demonstrates its capability of performing the intended function. The inventor does not need to construct a full-scale prototype for an invention to be reduced to practice. *See Standard Mfg. Co. Inc. v. United States,* 25 Cl.Ct. 1, 63 (1991); *McDonnell Douglas Corp. v. United States,* 229 Ct.Cl. 323, 329–30, 670 F.2d 156, 161 (1982).

The court finds that the structure built and tested under the '035 contract embodies all the claims of the 1987 patent. In defendant's "proposed findings of uncontroverted fact," defendant claims that the full-scale prototype built under the '035 contract includes all the claim limitations in the 1987 patent, with one minor modification. Although plaintiff does not affirmatively concede this fact, by failing to dispute defendant's declaration, plaintiff once again effectively admits that defendant satisfied this requirement. RCFC 56(d)(2) and (3); *see also Circle K Corp. v. United States,* 23 Cl.Ct. 659, 663 (1991). The court also notes that the '057 and '035 contract reports contain nearly identical descriptions of the structures built and tested as the 1987 patent description and claims limitations. The one modification mentioned by defendant does not prevent the contract invention from embodying all the claims in the 1987 patent. In fact, the 1987 patent states that "it [the 1987 patent] is intended to cover all modifications and alternate constructions falling within the spirit and scope of the invention."

Defendant claims that the 1987 patent was reduced to practice because the tests performed demonstrated the capability of the protective structural module to perform its intended function as disclosed in the patent. Under the '057 contract, the researchers built and tested one-fifth scale models of military bomb shelters using the hypar protective structure system. Under the '035 contract, the researchers built and blast tested a full-scale structure using the hypar technology disclosed in the 1975 and 1987 patents. The structure successfully resisted collapse from a 1000 pound blast, although the structure deformed more than the computer model had predicted.

Plaintiff argues that defendant cannot prove reduction to practice by the structures

built and tested under the '057 and '035 contracts because the tests were preliminary, incomplete and unsuccessful. Plaintiff claims that the test performed under the '057 contract failed to meet the essential requirement of imitating actual conditions. Plaintiff cites *Technical Dev. Corp. v. United States*, 220 Ct.Cl. 128, 597 F.2d 733 (1979), as support for its assertion that actual reduction to practice does not occur unless the testing environment fully simulates the characteristics and circumstances of a full scale operation. Plaintiff claims that the tests under the '057 contract, which used one-fifth scale models buried in the soil close to the surface, were not performed to test the patent technology. Rather, these preliminary tests were performed to develop proper testing procedures and to refine the design and construction of the prototype. Plaintiff argues that such crude testing does not demonstrate the workability of a bomb shelter in actual combat conditions beyond a probability of failure.

Plaintiff also claims that the testing procedures and the results obtained under the '035 contract failed to demonstrate that the invention disclosed in the 1987 patent will perform its intended function beyond a probability of failure. Plaintiff argues that the physical structures failed to meet certain design specifications and that the prototype failed to perform as the computer simulations had predicted. Also, plaintiff notes that the interior noise level in the shelter substantially exceeded OSHA's guidelines. Finally, plaintiff argues that Professors Moriarty and von Buelow proposed the '108 contract specifically to continue the research and testing of the hypar structure because the tests under the '035 contract were unsuccessful.

This court finds plaintiff's arguments unpersuasive. To determine whether defendant successfully reduced the 1987 patent to practice, the court must consider the patent claims to determine what is the invention's "intended function." The test for reduction to practice is not whether the physical structure performed perfectly, but rather, whether the structure performs the function claimed in the patent. *See McDonnell Douglas Corp. v. United States*, 229 Ct.Cl. 323, 670 F.2d 156 (1982); *Cochran v. Kresock*, 530 F.2d 385, 391 (CCPA 1976) (noting that "a reduction to practice does not require that the invention be perfect or incapable of further improvement.")

The court does not find convincing plaintiff's arguments that the '035 contract failed to reduce the invention to practice. The 1987 patent does not limit itself to design specifications as asserted by plaintiff, but intentionally encompasses all modifications "within the spirit and scope of the invention." The patent claims do not assert specific performance levels of the invention according to computer simulation. Likewise, the patent claims do not assert a type of sound protection. Thus, it is immaterial that the structure failed to perform as predicted by computer simulation or failed to meet OSHA guidelines for sound levels.

The preliminary tests performed under the '057 contract and the full-scale tests performed under the '035 contracts satisfied the 1987 patent claims and demonstrate that the invention performs its intended function. The patent claims describe a structural module suitable for use as a blast-resistant underground bomb shelter or other such protective structure. The patent claims do not include any specific measure of performance nor any structural deformation limits that the structure must satisfy. The 1987 patent does not claim a specific size or structure, it claims that "there is no intention to limit the invention" to the "preferred embodiments ... shown and described in the specification." The patent description stresses that the invention will perform its intended function, as a protective structure, and resist structural collapse "even if the rigid layers should fail," which actually did occur during the '035 test.

The court concludes that the tests performed under the '057 and '035 contracts prove what the 1987 patent claims: that the invention successfully operates as an protective bomb shelter. The tests performed under the '057 contract using the scale models demonstrated the feasibility of the project utilizing the hypar technology and structural methods claimed in the 1987 patent. The testing environment used under the '057 contract, although not simulating combat condi-

tions, sufficiently proved the feasibility of using the hypar structures. The '035 tests employed a full-scale model using the hypar structure and demonstrated that the invention worked according to the 1987 patent claim limitations. The contract invention performed as stated in the patent claims, the shelter resisted collapse and spalling.[6]

Equity also prevents this court from holding that the defendant failed to reduce to practice the 1987 patent under the '057 and '035 contracts. The court finds it ironic that plaintiff now argues that the '035 prototype did not perform its intended function when plaintiff asserted that the prototype was reduced to practice for purposes of obtaining the 1987 patent. Plaintiff relied on the same '035 tests which plaintiff now criticizes to demonstrate the success of the 1987 patent invention in the patent application.

The court finds that the final requirement for the license is also satisfied. The structures built and tested under the '057 and '035 contracts were the first reduction of practice using the 1987 patent technology. Plaintiff does not dispute that the one-fifth scale models built under the '057 contract represent the first time that the modular structures described in the 1987 patent were physically constructed. Plaintiff also does not dispute that the full-scale bomb shelter created under the '035 contract was the first full-sized shelter built using the 1987 patent invention.

Plaintiff gave defendant permission to use the 1987 patent invention when the structures were built and tested under the '035 contract. Pursuant to 28 U.S.C. 1498(a), plaintiff is not entitled to recovery for patent infringement if the patent owner gave his consent to the use of the patent. Plaintiff consented to all work performed under the '057 contract and cannot now argue that the structures built under the '057 contract infringed the 1987 patent. With regards to the '035 contract, plaintiff consented to the use of his patent under the '035 contract until October 1985. The '035 structure was tested in April 1985, six months before plaintiff withdrew his consent. Plaintiff cannot with-

draw his permission retroactively and claim infringement for the use of the 1987 patent after the invention had been built and tested under the '035 contract with his consent.

This court finds that defendant has met its burden of proof to demonstrate reduction of practice of the 1987 patent during the period of Dr. Kersavage's consent under the '057 and '035 Air Force contracts. First, the patent invention and contract invention are the same. Second, the contract invention is the physical embodiment of the patent claims. Third, the tests performed under the contracts demonstrate the invention's ability to perform its intended function. Therefore, defendant has a nonexclusive, irrevocable license to practice the invention disclosed in the 1987 patent.

Because defendant has a license to use the 1987 patent, defendant clearly has demonstrated that no genuine issue of material fact exists regarding infringement of the 1987 patent under the '035, the '108, or the Navy contract. Defendant did not infringe plaintiff's 1987 patent due to the license based upon the first reduction to practice by the government according to the terms of the '035 contract. Defendant, therefore, is entitled to judgment as a matter of law on this issue.

### B. The 1975 Patent

Defendant also claims that summary judgment is appropriate for the 1975 patent infringement claim because plaintiff fails to raise a genuine issue of material fact demonstrating that defendant infringed plaintiff's 1975 patent under the '035, '108, or Navy contracts. First, defendant argues that it did not infringe plaintiff's 1975 patent under the '035 contract for the same reasons that defendant did not infringe plaintiff's 1987 patent under the '035 contract. Second, defendant claims that it did not authorize the construction of a prototype under the Navy contract and any partial construction does not constitute infringement as a matter of law under 28 U.S.C. § 1498. Third, defen-

---

**6.** "Spalling" occurs when particles of concrete shatter and fall into the enclosed area of a struc- ture during a blast.

**452**

dant claims that the prototype constructed under the '108 contract did not embody the independent claims in plaintiff's 1975 patent and, thus, could not infringe plaintiff's patent.

### 1. *The '035 Contract*

█ The court finds that defendant did not infringe the 1975 patent under the '035 contract. Similar to the 1987 patent infringement analysis in section II(A), defendant received plaintiff's consent to use the 1975 patent during the building and testing of the '035 prototype. Although plaintiff withdrew his consent for the use of his patents, he did so after the construction and testing of the prototype. Plaintiff cannot retroactively withdraw his consent to defendant's use of the 1975 patent and then claim infringement by the '035 contract.

### 2. *The Navy Contract*

█ Defendant claims that because no prototype was completely constructed under the Navy contract, plaintiff cannot establish patent infringement under 28 U.S.C. § 1498 which authorizes compensation only when patented inventions are used or manufactured by or for the United States. Defendant argues that, as a matter of law, plaintiff cannot recover under § 1498 for any construction that "falls short" of direct patent infringement. *See Decca Ltd. v. United States,* 225 Ct.Cl. 326, 335, 640 F.2d 1156, 1167 (1980) *cert. denied,* 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). Defendant argues that even if plaintiff can prove that construction of a prototype was begun under the Navy contract, beginning a structure which incorporates ideas disclosed in a patent does not give rise to patent infringement under § 1498.

Plaintiff concedes that it has no proof that a prototype was built under the Navy contract. Plaintiff submitted newspaper photographs and the lecture flyer to demonstrate that a genuine issue of material facts exists regarding whether defendant *began* construction of a prototype under the Navy contract in violation of plaintiff's 1975 patent. Plaintiff argues that based on this evidence he can prove at trial that defendant began to build a structure which infringes plaintiff's 1975 patent and entitles plaintiff to a licensing fee.

Plaintiff requests this court to create an exception to the standard for patent infringement under 28 U.S.C. § 1498 because the alleged infringement occurred under a research contract. Plaintiff argues that the research contract is a unique circumstance and the standard for infringement should consider this factor because the contract itself has value to plaintiff and the University. Plaintiff argues that he wrongfully was deprived of the monetary benefit of the Navy contract and of the opportunity to obtain similar contracts and consulting fees while defendant received knowledge that the project may not be feasible. Plaintiff claims that, because defendant received this value based upon the information disclosed in plaintiff's patent, equity dictates that defendant pay plaintiff for this value obtained although defendant never built a complete structure using plaintiff's 1975 patent. This claim appears to be one for unjust enrichment. Its theoretical framework can be found in the body of equity dealing with quasi-contract, or contract implied-in-law, a remedy not traditionally available against the government.

█ Starting to infringe or an attempt to infringe a patent invention does not intrude on the patent owner's property interest in the underlying invention and does not give the patent owner a claim that this court or any other court has ever considered to be a valid basis for relief. *See, e.g.,* 4 D.S. Chisum, *Patents,* § 16.02 (2d ed. 1995). At oral argument, plaintiff's counsel stated regarding construction under the Navy contract, "it is true that this is not a bomb shelter. And it is not even probably a completed hypar shell." Plaintiff may have been wronged by his colleagues by their actions under the Navy contract, but an infringement suit against defendant is not the proper remedy. Patent law does not provide a remedy against a *potential* infringer under a research or any other type of contract. *Id.* The real gist of plaintiff's complaint is that Professors Moriarty and von Buelow 'did him out of a government contract.' This is not a

patent claim under § 1498 or any other theory.

This court declines to find liability based upon an arguable attempt to infringe plaintiff's 1975 patent by defendant under the Navy contract. Plaintiff's submission of newspaper photographs and a lecture flyer, which may prove partial construction under the Navy contract, are immaterial to the court's analysis because this material is (1) inadmissible and (2) does not prove construction of a prototype under the Navy contract if admitted. This court declines to create an exception to the body of patent law which would create liability for the use of ideas disclosed in a patent or for the partial construction of a patented invention. Such an exception would be ill-founded even where equity argued for it, as it does not argue here.

Because plaintiff cannot prove that a prototype was constructed under the Navy contract, no genuine issue of material fact exists regarding the alleged patent infringement under the Navy contract. Defendant, therefore, is entitled to judgement as a matter of law on this issue.

### 3. *The '108 Contract*

Finally, defendant claims that summary judgment is appropriate regarding the '108 contract because plaintiff fails to present sufficient evidence to demonstrate a genuine issue as to any material fact pursuant to RCFC 56. Both parties agree that the remaining issue is whether the '108 prototype embodies claims 1 and 5 of the 1975 patent. Defendant acknowledges that as the moving party, it bears the initial burden of establishing the absence of a material fact dispute. Defendant claims that it has satisfied its burden by providing evidence and affidavits that the prototype built under the '108 contract did not infringe the independent claims of plaintiff's patent. Defendant also argues that plaintiff failed to provide the court with any "specific facts" or admissible evidence of infringement beyond plaintiff's personal affidavits, thereby failing to meet the requirements of RCFC 56(c).

Plaintiff argues that a comparison of patent claims 1 and 5 in the 1975 patent with the '108 prototype as described in the final report "easily demonstrates" that patent claims 1 and 5 are present in the infringing device. As noted in section I(A), however, plaintiff did not participate in the construction of the '108 contract and does not possess personal knowledge of the prototype. Plaintiff failed to provide the court with affidavits from any party who possessed personal knowledge regarding the construction of the '108 prototype. Likewise, plaintiff failed to provide the court with any admissible, probative evidence regarding the '108 prototype. The pictures presented by plaintiff lack the proper foundation, and because of their ambiguity, would be virtually useless by an outside expert. Plaintiff provided no other documentary proof of his claim and relies solely on his own affidavit for the conclusion that the '108 prototype infringes the 1975 patent.

The court finds that plaintiff cannot demonstrate a genuine issue of material fact regarding infringement of the 1975 patent under the '108 contract. Plaintiff did not present any admissible evidence or affidavits from parties with personal knowledge to rebut defendant's claim that the '108 prototype did not infringe the 1975 patent. For example, in defendant's proposed findings of uncontroverted fact, defendant repeatedly argued that the '108 prototype did not embody claims 1 and 5 of plaintiff's 1975 patent. Specifically, in ¶ 92 of its proposed findings, defendant asserted that the polyester strips of the '108 prototype were placed in layers on the mold without any particular methodology and were neither anchored to a structural support nor stretched as described in plaintiff's 1975 patent. In response, plaintiff claims that "[t]his statement is completely incorrect.... The polyester strips were pulled 'taut.'" Plaintiff provides no evidence to support this statement, except Dr. Kersavage's own affidavit.

Plaintiff failed to provide the court with any documentary evidence or affidavits from parties with personal knowledge regarding the '108 prototype. Without further evidence, plaintiff's claim that defendant infringed his 1975 patent, even under oath, does not provide the court with suitable evidence to find a genuine issue of material fact for which a trial is necessary. Defendant,

therefore, is entitled to judgement as a matter of law on this issue.

The court GRANTS defendant's motion for summary judgment in its entirety. The Clerk of the Court is hereby instructed to dismiss plaintiff's complaint.

IT IS SO ORDERED.

APPENDIX A - page 1

APPENDIX A - page 2

APPENDIX A - page 3

APPENDIX A - page 4

458

# The Daily Beacon

University of Tennessee, Knoxville

Vol. 50, No. 9 – Tuesday, January 24, 1989

## Professor files suit against UT

### University requests dismissal of patent infringement claims

By DONNA CRUZE and
NATHAN ROWELL

A UT architecture professor has filed a $500,000 lawsuit claiming patent infringement against the university and two of its professors.

Joseph Kersavage, an architecture professor at UT since 1972, filed suit in U.S. District court in late December, asking for $500,000 in damages, plus an additional $500,000 "resulting from the willful, intentional and deliberate character of the defendants' infringing acts," plus attorney's fees.

In the lawsuit, Kersavage claims the university, along with two other professors, Thomas Moriarty of the College of Engineering, and Peter von Buelow of the School of Architecture, have violated his patents on the "structures and methods for constructing a tensile-strength structure and protective structural module."

Moriarty, when contacted by the Beacon, referred all questions about the case to Ron Leadbetter, UT associate general counsel, who is representing the defense. Leadbetter called Kersavage "all wet."

Leadbetter said Monday he planned to file a motion this week asking for summary judgment or dismissal of Kersavage's suit.

Kersavage's suit says the university gained "valuable contract rights" and that Moriarty and von Buelow "have personally benefitted from the unauthorized and improper use" of the patents.

In the lawsuit, Kersavage is asking that Moriarty and von Buelow refrain from further use of his patents and account for profits they have gained in the past from them. The patents Ker-

savage, said.

1987.

He charges the alleged patent infringement has cost him customers who might otherwise buy his inventions or would compensate him for their use and also has deprived him of consultation fees connected with the patents.

"The contracts are based on my patents, and I end up with nothing. I'm hoping that with the change in administration here that President Alexander hears this and will move to rectify some of these problems because they cite the university) are stifling innovations, and they are just plain unjust," Kersavage said.

One application of Kersavage's invention is a blast-proof shelter that was tested by the military and confirmed to be able to withstand the impact of 1,000 pounds of TNT, Kersavage said.

Kersavage sent a letter outlining his complaints in October 1985 to Vice-Provost Hardy Liston, Roy Knight, former dean of the School of Architecture, W. T. Snyder, dean of the College of Engineering, Tom Collins, vice provost of research, and Moriarty and von Buelow.

Kersavage wrote, "Moriarty and von Buelow seem to be under the mistaken belief that my patents and patents pending can be circumvented. . . . Legal precedent has already been established in a similar case."

Kersavage said he never got a reply to that letter.

One of the reasons Kersavage said he was filing suit was because he could no longer afford to continue research on his inventions.

"I'm not a rich man. I'm here at the university as a professor. And I find tens of thousands of dollars tied up in

"It's impossible to make a living, because you put the time and money into it a research project, and then once it has gotten somewhere, a large organization jumps in, particularly like the university that has all the advantages of a nonprofit organization and essentially has slave labor in the form of students. There is no way in blazes that anyone can compete with them," he said during an interview with the Beacon.

Kersavage said he was not looking forward to suing the university, but felt it was necessary.

"I've been here for almost 17 years, and I've got to use my own university for violating my own patent. That's insane, but it's the only thing that can be done.

"There's no reason for us cutting our own throats here, but I'm not going to sit back and let people flagrantly use my own ideas which violate my patent, and use my own creative work," he said.

Kersavage first became aware of the structure he claims infringes upon his patent when he was walking through the Art and Architecture Building early in July and saw two students assembling the structure.

Kersavage told the students what they were building was an infringement on his patent. He said the structure was taken down within 24 hours after that.

However, in an unrelated incident, a Beacon photographer took pictures of the project before it was dismantled. A photo of the project was reproduced in an early July issue of the paper.

One of the students who was working on the structure said he thought they were not infringing on Kersavage's patents, based on research

TONI
The Daily Be

U.S. Patent
December 23, 197
3,927,498

1014

Figure 7
of patent

Violation?

The structure above was constructed in the Art and Architecture Building. Joseph Kersavage claims the structure is a violation of his patent, below.

# woes

...ishers
...roblems
...nsumers

...ed a session on journal thing.

...concern among the press sentatives was the practice of publishing corporations buying maller, successful firms.

...e "swallowing up" of independer publishers may well endanger ...r future existence, she ...ulated.

...her paper, Orr expounded on the ...us forms of cooperation in which ...ersity presses engage.

...ne way we cooperate is to have ...shops," she said. Matters of ...n, production, advertising and ...g are some of the topics discussi- ...the workshops, and participants ...from one another ways to im- ...e such aspects of scholarly ...lshing.

...other form of cooperation Orr ...ed about was the Southern ...ersity Presses Marketing Group, ...organization that hires sales ...esentatives to promote par- ...ating universities' books to ...mal bookstores.

...amples of such books the UT ...s has published are The Southern ...tern Appalachian Community, a ...trians, a specialized literary ...als by Paul Conkin; Cades ...: The Life and Death of a ...hern Appalachian Community, a ...general interest work by Dur- ...d Dunn; and Black American ...s Between Worlds, edited by UT ...

...al facility anywhere. It's ...ely one of the best in the coun- ...o said.

...how does the university intend on improving the library's collection?

Hunt said the mission of libraries was changing.

"Ten years down the road, access "UT has no ultimate goal toward the total number of books the library should contain, administrators say

don't need to hang our heads in shame. We have a good foundation on which to build," Hunt said.

## Navy secret?

Russell Threos (foreground), who is working on his second degree in architecture and Gale Pilkinton, fifth-year architecture major, assemble a research project in the Art and Architecture Building. The project is being conducted for the Department of the Navy.

TONG SI Daily Beacon Staff Photographer

APPENDIX C

# THE UNIVERSITY OF TENNESSEE
# SCHOOL OF ARCHITECTURE
# FALL SEMESTER LECTURE SERIES
November 9, 1988, at 8.00 pm in The Art & Architecture Building, Room 109

# PETER von BUELOW
### RESEARCH PROFESSOR IN ARCHITECTURE, UTK

# The Modularch System

"The marine corps has requirements for expeditionary shelters to provide protection from the environment for command and control, maintenance, aircraft storage, and other combat support functions. Marine Corps expeditionary shelters must be lightweight, easily transported, quickly erected and relocatable in order to support amphibious operations in extreme climates. Through application of tension structure technology, it is intended to develop a family of shelters ranging in size from approximately 20' x 40' to 60' x 120'. These shelters will be based on a singular modular design with interchangeable components and similar concepts of assembly and operation." This is the introduction to the Statement of Work of a research effort which has occupied Dr Thomas Moriarty and Peter von Buelow for the past two years. A prototype of the Modularch, a modular structural system which has spawned from this work, is currently being built at the University of Tennessee. Peter von Buelow will explain the concepts of this new system and give examples of how some of the details evolved.